## THE KENSINGTON.

(District Court, S. D. New York. July 6, 1898.)

1. **CARRIERS BY SEA—PASSENGERS' BAGGAGE—SEA PERILS—BURDEN OF PROOF —STOWAGE—EXEMPTIONS FOR NEGLIGENCE—FOREIGN LAW—HARTER ACT.**

   Extraordinarily rough weather warrants a finding of damage to cargo or baggage by sea perils, provided proof of ordinary good stowage is first given by the ship. This preliminary burden is upon the ship, and cannot rest upon mere presumption. Exemptions for negligence contracted for in a foreign port on a foreign vessel, though valid where made, will not excuse torts and consequent damage within our territorial jurisdiction. The Harter act does not apply to passengers or their baggage.

2. **SAME—LIMITING LIABILITY BY CONTRACT.**

   It is competent for carriers by sea to limit their liability for passengers' baggage to a specified sum, unless higher rates are paid for any excess in value; and when this provision is plainly incorporated in the body of the ticket, and ample opportunity is afforded the passenger to know it and comply with it, it becomes a part of the contract of carriage and binding, and in this case was *held* to limit the libelants' recovery.

Roger Foster, for libelants.
Robinson, Biddle & Ward, for claimant.

BROWN, District Judge. The above libel was filed by Mrs. Bleecker and her daughter to recover for the loss of their trunks and personal effects upon their passage by the British steamship Kensington, of the Red Star Line, from Antwerp to New York in December, 1897. The defense was a loss by sea perils, and second, a limitation to the sum of 250 francs under the provisions of the passenger ticket.

The libelants' trunks were stowed in what was known as No. 2 upper steerage in the after part of the third deck above the hold, sometimes used for passengers. A few other trunks were stowed there, and some crates of china. The steamer sailed from Antwerp December 11th. The voyage was extremely rough. For the most of the time the passengers were not allowed on deck. On December

20th the steamer met a very heavy gale in which she labored heavily and was obliged to lie to for 14 or 15 hours, which had not previously occurred in the master's experience of 23 years. The steamer was a first-class ship of about 8,000 tons. In this gale some of the baggage got adrift, both in No. 2 steerage and in the steerage on the deck below. As soon as it was possible the apartment where the libelants' baggage was stowed was examined, and the captain describes it as being in a state of chaos. Trunks and crates were broken and damaged by water in the apartment, coming from the condensation of steam from a steam pipe which had been carried away in the storm. The vessel arrived in New York on the morning of December 23d. The value of the contents of the trunks was above 250 francs for each of the two passengers, and it is stated in the libel to have been of the value of $2,000. The libelants had been traveling in Europe for about a year. The evidence leaves no doubt that the ticket for the two passengers, which is marked "Claimant's Exhibit A," was purchased by Mrs. Bleecker in Paris on December 2d. She testifies that at that time she paid part of the money for the passage and afterwards on arrival at Antwerp paid the rest. The ticket is dated at Paris December 2, 1897; and there is a stamped receipt beneath the signature of the ticket, dated at Antwerp, December 10th, for the balance of the passage money. This accords with the testimony of Mrs. Bleecker, that she paid this balance at the office of the company in Antwerp on the day before the steamer sailed, and at the same time delivered her trunks and received her baggage check, stating that it was shipped "subject to the conditions contained in the company's ticket and bill of lading."

In the body of the ticket, under the head of "Notice to Passengers," it is stated as follows:

"It is a condition upon which this ticket is granted and is mutually agreed for the consideration aforesaid that" * * *. Here follow 10 paragraphs in type somewhat smaller than the preceding type, but perfectly clear and legible, stating numerous conditions. These 10 paragraphs are followed by the provision: "All questions arising hereunder are to be settled according to Belgian law with reference to which this contract is made;" after which is the signature of the company's agent. The third paragraph provides that "the shipowner or agent are not under any circumstances liable for loss, default, injury or delay to the passenger or his baggage, arising from the act of God, public enemies, fire, robbers, thieves of whatever kind, whether on board the steamer or not, perils of the sea, rivers, or navigation, accidents to or of machinery, boilers or steam" * * * "or from any act, neglect or default of the shipowners' servants, whether on board the steamer or not."

"The shipowner or agent shall not under any circumstances be liable for any loss or delay of or injury to passengers' baggage carried under this ticket beyond the sum of 250 francs, at which such baggage is hereby valued, unless a bill of lading or receipt be given therefor and freight paid in advance on the excess value at the rate of one per cent. or its equivalent."

At the time when her baggage was delivered to the company at Antwerp on the 10th of December, Mrs. Bleecker made no statement of its value, and paid no freight on its excess over 250 francs.

No evidence was introduced as to the particular mode of stowage, except that it was stowed by the company's stevedore at Amsterdam under the supervision of the third officer, who at the time of the trial was sick there.

1. Contrary to the libelants' contention, I must hold upon the authorities that a ticket of the character above described for a transatlantic passage is a unilateral contract, and like a bill of lading is binding upon the person who receives it, so far as its provisions are reasonable and valid. It is essentially of the same character as the ticket in the case of Steers v. Steamship Co., (57 N. Y. 1,) where Johnson, J., in reference to a claim similar to this observes:

"The plaintiff, by her agent, was an applicant for a passage to Europe by the defendant's ship, the voyage to be commenced at a future day, and received on payment of the price a written engagement from the defendant expressing its undertaking. A printed facsimile of this paper is before us, and although part of it is in smaller type than the rest, no part of it is in such type as to suggest to the mind the idea of concealment as the possible motive for its being so printed." * * * "Looking to the course of business, the court may take notice that an engagement for a voyage across the ocean is a matter of more deliberation and attention than buying a railroad ticket or taking an express company's receipt for baggage or for freight. There is, therefore, no room in such a case for the suggestion that the party is surprised into a contract, when he supposes himself only to be taking a token indicative of his right. The paper in evidence ought, therefore, to be regarded as having received the mutual assent of the parties, and as being, as its language purports, their contract touching the voyage in question."

I find nothing later diminishing the force of these observations. See Zimmer v. Railroad Co., 137 N. Y. 460, 463, 33 N. E. 642.

2. One of the exemptions specified in this ticket or contract is losses "by perils of the sea," and upon the evidence, if preliminary proof of good stowage had been given, I think a prima facie case of loss by sea perils would have been made out, which it was incumbent on the libelants to rebut by proof of negligence in the ship. The evidence leaves no doubt that the passage was one of very extraordinary severity, such as might account naturally for what happened, viz. the baggage getting adrift and breaking the steam pipe, even though the baggage was well stowed; but it might also have happened from poor stowage, of which some evidence was sought to be given, though I do not regard it as of much weight. There is no direct evidence of the mode of stowage, but only that the baggage was stowed by the regular stevedore of the line. It is urged that this furnishes a reasonable inference of customary good stowage; and when there is proof, as there is in this case, of very extraordinary weather and rolling of the ship, such as would naturally cause baggage stowed with ordinary care to get adrift, it is claimed that the authorities indicate that the burden of proof is on the libelants to show some negligence, but for which the loss might nevertheless have been avoided. See Clark v. Barnwell, 12 How. 272, 280. The supreme court in that case approved the ruling of Lord Chief Justice Denman in Muddle v. Stride, 9 Car. & P. 380:

"That if on the whole it be left in doubt what the cause of the injury is, or if it may as well be attributable to perils of the sea as to negligence, the plaintiff cannot recover," * * * "but the jury were to see clearly if the defendants were guilty of negligence before they could find a verdict against them."

In the case of The Neptune, 6 Blatchf. 193, Fed. Cas. No. 10,118, the same point was ruled where a steamship "encountered on the voyage an unusually violent storm which fully accounted for the damage within an exception in the bill of lading"; and it was held by Mr. Justice Nelson that this threw the onus on the shipper to establish carelessness or negligence on the part of the master or owner of the vessel leading to the particular loss; and for failure to establish this a decree dismissing the libel was affirmed. See The Fern Holme, 24 Fed. 502, 503; The Portuense, 35 Fed. 670. These cases, however, do not dispense with the usual proof of good stowage by the ship. To assume proper stowage upon mere inference, and to throw upon a shipper or passenger the burden of proving the contrary, without any proof by the ship, seems unreasonable and inequitable, considering that proof on this subject is peculiarly within the power of the ship to produce, and comparatively easy for her, but difficult if not impossible for the passenger or shipper. Proper stowage, moreover, is essential to seaworthiness as respects cargo, or baggage; and hence this essential preliminary condition of seaworthiness should have been established by the ship by proof of proper stowage, just as in The Edwin I. Morrison, 153 U. S. 210, 14 Sup. Ct. 829, it was held necessary to be established by proof of proper inspection. In Clark v. Barnwell, supra, it is expressly stated in the opinion of the court (page 281) that the stowage was good. The record and the opinion of Shipman, J., in the court below in the case of The Neptune show the same; and the same appears in the other cases above cited. This branch of the defense, therefore, I cannot sustain.

3. The limitation of liability to 250 francs, is a limitation which it was competent for the defendant company to make. Hart v. Railroad Co., 112 U. S. 331, 5 Sup. Ct. 151. The libelants are chargeable with notice of this provision whether they read the contract or not. The ticket was in their possession for more than a week before the ship sailed, and before the baggage was delivered to the company. Every European traveler knows how much more exacting there than with us are the usual conditions as respects the transportation of luggage, and the extra charges therefor. There was nothing to justify the libelants in supposing there were no restrictions as to baggage; and they had abundant opportunity to examine the clear provisions of their ticket; and if they were ignorant of them it was by their own choice. It is not unreasonable that carriers should refuse for an ordinary charge to hold themselves answerable for an extraordinary or indefinite responsibility, and to charge extra compensation for increased risks; if travelers pay no attention to the provisions on these points incorporated into the contract of carriage, it is right that they should themselves bear the additional risk.

In the recent case of Calderon v. Steamship Co. (April 25, 1898) 18 Sup. Ct. 588, the supreme court, in refusing to the carrier the benefit of any limitation, did so upon the distinct ground that the limitation there sought was against all liability, and recognized the validity of such a limitation as is here provided.

4. Proof was taken by depositions that the Belgian law sustains exemptions of carriers from responsibility for the negligence of servants when the contract so provides. In the answer to the cross interrogatories on this point, the witness did not state at length the authorities and decisions in the sense in which the libelants' counsel intended by his interrogatories that the witness should state; but the answer is in such form, with a reference to the authorities relied upon, that I do not think there was any intent on the witness' part to evade the question, which in translation into another language may have appeared only to call for the references to the authorities instead of the language of the decisions; and indeed the language of the decisions was not in terms asked for by the interrogatories. I do not think the failure to answer the cross interrogatories more fully, therefore, detracts from the credit to be given to the deposition, which is in fact in accord with the general law of Continental Europe. The libelants' counsel, however, in preferring to proceed to trial rather than incur the delay of sending the commission back to the commissioner for further answers on this point, in effect waived any objection on this score.

This contract of carriage was, however, to be performed in part within our own jurisdiction, by the delivery of the baggage here in good condition; and though the presumed negligence as respects proper stowage was negligence abroad, it cannot be said that none of the consequent damage occurred within our jurisdiction. Upon the evidence I think that damage to the extent of at least 250 francs, as to each libelant, did occur here; so that the cause of action in part arose here; and in such cases our own law, as respects exemptions that are against public policy, must, I think, control. It is not competent for the respondent to defend a tort committed here by proof of a foreign contract void as against our public policy. It is a question of comity purely; and comity does not require us to reverse our own policy as respects torts committed within our own territorial jurisdiction. The Brantford City, 32 Fed. 324.

I have heretofore held that the Harter act has reference to the transportation of "cargo," and does not apply to the transportation of passengers, nor to their baggage when not shipped as cargo, or on payment of freight. The Rosedale and The Oregon (March 28, 1898) 88 Fed. 324.

Decree for the libelants for the equivalent of 250 francs each, with interest and costs.